UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| FOSTER BATES, | ) |
| | ) |
| Petitioner | ) |
| | ) |
| v. | )   1:24-cv-00175-JAW |
| | ) |
| NATHAN THAYER, | ) |
| | ) |
| Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

Petitioner, pursuant to 28 U.S.C. § 2254, seeks relief from a state court conviction and sentence for murder and gross sexual assault. (Petition, ECF No. 1.) Petitioner alleges ineffective assistance of counsel, violation of his right to an impartial jury, prosecutorial misconduct, and insufficient evidence to support the convictions. The State asks the Court to dismiss the petition. (Response, ECF No. 5.)

After a review of the section 2254 petition, the State's request for dismissal, and the record, I recommend the Court grant the State's request and dismiss the petition.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

**A.      The Crime and the Investigation**

On Sunday, February 20, 1994, police were called to an apartment complex in South Portland. The responding officer saw the deceased body of a woman, later identified as

---

[1] The facts recounted below are drawn primarily from state court summaries, *see* 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"); *Hensley v. Roden*, 755 F.3d 724, 727 (1st Cir. 2014) (recounting the facts as "derived from the [state court]

twenty-one-year-old Tammy Dickson.  The officer also found Ms. Dickson's infant son in a playpen in a bedroom.  After removing a blanket covering Ms. Dickson's body, the officer found Ms. Dickson was naked from the waist down with her hands bound behind her back and a pillowcase and clothing covering her face.  The medical examiner noted bruises and rug burns on the body, found a green sock in the victim's mouth, and determined that the cause of death was strangulation. Police interviewed neighbors and other individuals who knew Ms. Dickson.

Ms. Dickson frequently had morning coffee with three of her neighbors.  Her neighbors became concerned when she missed their morning coffee routine on Friday, February 18 and Saturday, February 19.  One neighbor noticed that Ms. Dickson's car was parked near the apartments, but her apartment door was locked, and she did not answer when the neighbor knocked on the door.  Ms. Dickson had an on-again off-again romantic relationship with William Quinn.  The neighbor contacted Mr. Quinn because she knew that he had a key to the apartment.  The neighbor called the police after Mr. Quinn entered the apartment and discovered the body.

Petitioner, who had also been Ms. Dickson's neighbor, denied that they had any relationship other than that she was a babysitter for his child.  Petitioner said he had not seen Ms. Dickson in the week before her death and that on the night of the murder, he

---

decision"), as well as the transcripts, dockets, and other filings in the state court record to the extent the filings contained important undisputed facts.

attended a basketball game and then was at home with his wife. Petitioner's wife also told police that Petitioner was at home after the basketball game.

According to one of Ms. Dickson's other neighbors, about one month before the murder, Ms. Dickson came to her apartment carrying her child in the middle of the night, shaking and scared, and reported that she woke up to find Petitioner sitting beside her, stroking her hair, and telling her that he wanted her to hold him. One of Petitioner's coworkers at a nearby convenience store told police that after the neighbor left the store, Petitioner told the coworker that he had been in the apartment on the night of the murder after the basketball game and that police suspected that he was having an affair with Ms. Dickson but that if he was, no one would know about it because he was not talking about it. When interviewed by police, Petitioner denied having entered the apartment at night while Ms. Dickson slept and denied ever having sex with her.

Police obtained blood samples from the men that Ms. Dickson knew, including her ex-husband, Mr. Quinn, and Petitioner. At the time, Ms. Dickson and her ex-husband had been separated for a year. The two were recently divorced at the time of the murder. The FBI crime lab in Washington, D.C., analyzed the samples and developed genetic profiles from the samples. Mr. Quinn's and other individuals' DNA was present on items in the apartment. The results of the vaginal swabs excluded the other individuals except for Petitioner and the victim, but the test results did not provide an affirmative match for anyone.

In June 1996, police questioned Mr. Quinn again. Because Mr. Quinn mentioned that Ms. Dickson had a sock in her mouth, which information the police had not revealed

publicly, they accused him of the murder. Mr. Quinn acknowledged that because he had been drinking heavily that night, it was possible for him to have gone to Ms. Dickson's apartment the night of the murder.

In 1997, using more advanced DNA methodologies, the newly created DNA section of the state crime lab determined that the DNA on the genital swabs and smears excluded Mr. Quinn and that there was a high probability match for Petitioner and the victim. Petitioner and his wife had since divorced, and when police reinterviewed Petitioner's former wife, she said that contrary to her previous statement, Petitioner had in fact left the house on the night of the murder and did not return until approximately 3:00 in the morning. Petitioner was told that his DNA was found on the swabs, but he reiterated to police that he had never had sex with the Ms. Dickson.

**B.    Trial and Direct Appeal**

In August 2001, Petitioner was arrested and indicted for murder in violation of 17-A M.R.S. § 201(1)(A) and gross sexual assault in violation of 17-A M.R.S. § 253(1)(A). Before trial, Petitioner sought to exclude any evidence concerning the fact that the child had been left with his dead mother. At the time of jury selection, the court had not yet ruled on the request. On the morning of jury selection, a local newspaper published an article about the crime. The article disclosed that Ms. Dickson's eighteen-month-old child was found in his playpen.

When the court inquired about the article, seventeen members of the seventy-five-person venire responded that they had seen the article. Those who had read the article were questioned further about the article and its possible impact on their ability to serve on the

4

jury.  Most of the seventeen were challenged for cause and were excused.  Three individuals remained in the venire.  The three individuals asserted that they could decide the case based only on the evidence presented, and neither side challenged them for cause. Neither side used a peremptory challenge to exclude them. The three individuals were selected and served as members of the jury.  After jury selection, the State advised that it would not present evidence of the child's presence.

At the jury trial in July 2002, witnesses, including the neighbors, testified largely consistent with the statements to police summarized above.  Petitioner testified and presented a different account from the one he previously gave to investigators.  According to Petitioner, he and Ms. Dickson were having an affair for several months and had sex the night before the murder.  Petitioner stated that he stopped at Ms. Dickson's apartment following the basketball game, but after finding the lights off and the door locked, he returned to his apartment where he remained for the rest of the night.  Defense counsel pointed to Mr. Quinn as an alternate perpetrator.  The jury found Petitioner guilty on both counts.

In September 2002, the Superior Court sentenced Petitioner to life in prison on the murder conviction and to a concurrent thirty-year-term on the gross sexual assault conviction.  Petitioner appealed from the convictions and sought review of the sentence. On direct appeal, Petitioner argued that (1) the trial court denied him a fair and impartial jury by seating three jurors who had read a newspaper article about the case, (2) the spousal communication privilege should have barred Petitioner's ex-wife from testifying that he left their apartment on the night of the murder, and (3) the evidence was insufficient to

support the convictions.   In May 2003, the Law Court affirmed the conviction and sentences.  *State v. Bates*, 2003 ME 67, 822 A.2d 1129.

## C.   DNA Motion, First Collateral Attack, and First Federal Petition

In August 2003, Petitioner filed a state court postconviction petition arguing (as later amended) that: (1) counsel should have challenged three jurors who had read an article about the crime before jury selection, (2) counsel should have consulted Petitioner more during the jury selection process, (3) counsel should have arranged for independent DNA testing, (4) counsel should have called additional witnesses, (5) Maine's juror selection process is unconstitutional, and (6) his sentence was improper based on the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), which Petitioner argued should apply retroactively to his case on postconviction review.  In September 2007, the Superior Court denied the petition.  Petitioner sought discretionary review from the Law Court; in September 2008, the Law Court denied a certificate of probable cause to appeal from the first postconviction decision.

While the petition was pending, Petitioner filed a post-judgment motion seeking additional DNA testing on certain items; the Superior Court granted the motion.  In January 2009, Petitioner filed a federal § 2254 habeas petition asserting similar grounds as in the state petition.  (First § 2254 Petition at 5–10, 1:09-cv-00006-JAW, ECF No. 1.)  The Court dismissed the federal petition without prejudice in February 2009 because Petitioner had not exhausted the available state court remedies.  (Recommended Decision, 1:09-cv-00006-JAW, ECF No. 4; Order, 1:09-cv-00006-JAW, ECF No. 7.)

In April 2010, the state crime lab submitted a report containing the results of the DNA testing authorized by the state court; the results did not contain any new evidence. The FBI lab and the state crime lab did not retest the green sock found in the victim's mouth and simply noted that it was not the lab's practice to perform mitochondrial DNA testing for epithelial or "touch" DNA samples. The sock had been tested in 2001 and again in 2002, but the method used at that time did not yield DNA evidence.

In 2011, by agreement of the parties, Petitioner retained an independent lab to perform additional DNA testing. As relevant to the parties' subsequent arguments, the independent lab tested two areas of the green sock, which produced a Y-STR[2] profile from the exterior area of the sock and a partial Y-STR profile from the interior toe area. The profile created from the exterior of the sock was consistent with a mixture of DNA from three or more contributors, with one major contributor who could not have been one of the eighteen male individuals tested in connection with the case, including Mr. Quinn and Petitioner. Ms. Dickson's ex-husband could not be excluded as the major contributor. The profile created from the interior toe area was consistent with a mixture of at least two individuals' DNA. The results excluded eleven of the males tested in connection with the case, including Petitioner, but the results could neither include nor exclude seven individuals, including Mr. Quinn and Ms. Dickson's ex-husband. In February 2014, Petitioner moved for a new trial, asserting that the additional DNA evidence, when

---

[2] As the Law Court has explained, the Y-STR method examines short repeated segments of base pairs at loci specific to the male "Y" sex chromosome, which means it cannot distinguish among members of a paternal line. *State v. Bates*, 2018 ME 5, ¶ 4 n.4, 177 A.3d 621 (2018).

considered with all the other evidence in the case, made it probable that a retrial would result in a different verdict.

In December 2014, a hearing was scheduled on the new DNA evidence, but Petitioner's attorney requested a continuance because a woman (Melody Higgins) had contacted him with information about the case.  Ms. Higgins told counsel that on the morning after the murder, she received a phone call from her sister, Cindy, who told Melody that her then-boyfriend and later husband, Michael Bridges, had come home drunk, screamed that he killed a girl and referenced a baby in a playpen. *State v. Bates*, 2018 ME 5, ¶ 19, 177 A.3d 621, 626.  The Superior Court granted a continuance to permit further investigation.

Police interviewed Shawna Poulin, who said she had overheard Michael Bridges tell Cindy that he had killed a woman.  In April 2015, the independent lab released an additional report concluding that Michael Bridges was excluded as a contributor of the DNA on the exterior of the sock and could not be included or excluded as a contributor to the DNA on the interior of the sock.

In June 2016, the court conducted a hearing on the new DNA evidence.  Defense counsel subpoenaed Amanda Indigo (also known as Amanda Bridges) and Shawna Poulin to testify at the hearing because Petitioner had heard they might have additional exculpatory information.  Ms. Poulin did not respond to the subpoena, but Ms. Indigo testified that on the night of the murder: (1) she saw Petitioner leave Ms. Dickson's apartment, (2) she spoke with Ms. Dickson at the entryway of Ms. Dickson's apartment, (3) she concluded from various observations that Petitioner and Ms. Dickson had just had

sex, and (4) Michael Bridges was present at a party in an apartment across the hallway from Ms. Dickson's apartment on the same night.

In November 2016, the Superior Court denied the motion for a new trial because the new DNA evidence did not establish that a different verdict would likely result from a new trial. Because Ms. Indigo's testimony did not concern any of the new DNA evidence, the state court did not consider the testimony. The court reasoned that under the relevant Maine statutes, the proper avenue for relief based on non-DNA evidence was a new postconviction petition, but the court noted that such a petition might be barred by the one-year statute of limitations, which begins to run when the factual predicate for the claim reasonably could have been discovered.

Petitioner sought discretionary review from the Law Court. The Law Court affirmed. *Bates*, 2018 ME 5, ¶ 1. As relevant here, the Law Court primarily reasoned that (1) the evidence did not show that Petitioner did not touch the sock because it was just as likely that he touched it but did not leave DNA either because he wore gloves or because he touched it in a location that did not yield DNA testing evidence, (2) the DNA on the sock has no definitive connection to the crime because it could have been left at a different time or manner, and (3) the trial court did not err by failing to consider Ms. Higgins' statement to counsel or Ms. Indigo's testimony because the statements did not identify an alternate suspect that was relevant to the source of the DNA, because Mr. Bridges could not be included nor excluded as a contributor of the DNA on the green sock. *Id.* at ¶¶ 11–13, 21–22.

**D.**  **Second and Third State Collateral Attacks and Second Federal Petition**

In June 2017, just under one year after the hearing on the DNA motion, Petitioner filed a second state postconviction review petition. The State moved to dismiss the petition as untimely filed. In March 2019, the State included as an exhibit to its response to Petitioner's second postconviction review petition a police report documenting the December 2014 Shawna Poulin interview. Petitioner, who asserted that the State had not previously produced the report, sought to supplement his second state postconviction petition in May 2019 based on information in the report.

In July 2019, the Superior Court dismissed the petition as untimely, reasoning that even if Petitioner was personally unaware of Ms. Indigo's assertions until the June 2016 hearing, it was not plausible that counsel was unaware of her assertions before then, and the defense could have discovered the information with the exercise of diligence more than one year before filing the petition. The Superior Court also concluded that the failure to disclose the Poulin interview did not violate fundamental notions of fairness because the state had no duty to disclose the police report during the DNA motion proceeding, because discovery was not authorized on the topic, and because it was not relevant to the DNA testing at issue in that proceeding. Petitioner sought discretionary review from the Law Court; in June 2020, the Law Court denied a certificate of probable cause to appeal.

In January 2020, Petitioner filed a third state court petition for postconviction review. As relevant here, Petitioner asserted: (1) there was newly discovered evidence regarding the statements of Ms. Poulin and Ms. Indigo, (2) the state violated his due process rights by failing to disclose Ms. Poulin's statements, (3) counsel provided ineffective

assistance by not promptly filing the second postconviction petition, and (4) an actual innocence claim. The Superior Court dismissed some claims, including the due process claim, and in July 2023, the Superior Court held a three-day evidentiary hearing regarding the remaining ground for relief.

When Ms. Poulin testified at the hearing, she recanted the statements she had previously given. Ms. Indigo provided some testimony that was consistent with her earlier statements, but she admitted that she was not truthful about the observations that led to her conclusion that Petitioner and Ms. Dickson had sex on the night of the murder. Another witness also contradicted certain aspects of Ms. Indigo's testimony. A forensic expert also testified. The expert did not perform further DNA testing but offered additional opinions about the prior testing. In the opinion of the expert, the lack of certain forensic evidence, such as the absence of trauma with the fingernails or genitals and the lack of foreign secretions or hairs on the body, suggested that it was not necessarily a violent sexual assault that had occurred rather than simply a violent attack. The expert also placed greater weight on the absence of Petitioner's DNA on the green sock, because she would have expected there to be detectable DNA from the person who forced it into the victim's mouth, unless that person was wearing gloves.

In December 2023, the Superior Court denied postconviction relief. The court reasoned that (1) the parties essentially agreed that counsel during the first round of post-judgment motions had provided ineffective assistance by waiting to file the second postconviction petition based on the new witness statements, (2) the remedy for the ineffective assistance was to consider the merits of the claims despite the statute of

11

limitations, but (3) the new evidence presented at the hearing did not warrant postconviction relief because the testimony did not establish that a different verdict would likely result after a new trial. Petitioner sought discretionary review from the Law Court; in April 2024, the request for a certificate of probable cause to appeal the third postconviction decision was denied.

Petitioner then filed the current federal petition.

## DISCUSSION

### A.    Legal Standards

Pursuant to 28 U.S.C. § 2254(a), a person in custody pursuant to the judgment of a state court may apply to a federal district court for a writ of habeas corpus "only on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States."

Absent circumstances not relevant to Petitioner's case, a petitioner is required to exhaust available state court remedies before he seeks federal habeas review. 28 U.S.C. § 2254(b), (c).[3] "Before seeking a federal writ of habeas corpus, a state prisoner must

---

[3] Title 28 U.S.C. § 2254(b) and (c) address exhaustion and state:

**(b) (1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

**(A)** the applicant has exhausted the remedies available in the courts of the State; or

**(B) (i)** there is an absence of available State corrective process; or

**(ii)** circumstances exist that render such process ineffective to protect the rights of the applicant.

**(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry,* 513 U.S. 364, 365 (1995) (per curiam)) (quotation marks omitted).  In *Baldwin,* the Court noted that "[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (quoting *Duncan,* 513 U.S. at 365–66).

To exhaust a claim fully in state court in Maine, a petitioner must request discretionary review by the Law Court.  *See* 15 M.R.S. § 2131.  The Supreme Court has held that a procedural default bars federal review absent cause for the default and prejudice to the petitioner:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

---

**(3)** A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

**(c)** An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[4]  A "fundamental miscarriage of justice" has only been recognized in cases of "actual innocence," meaning that the petitioner must demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Gunter v. Maloney*, 291 F.3d 74, 83 (1st Cir. 2002) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Because the constitutional right to counsel does not extend beyond a direct appeal to cover collateral attacks on a conviction, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987), ineffective assistance in a state postconviction proceeding generally cannot establish cause to set aside a procedural default.  *Coleman*, 501 U.S. at 752–55.  In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court recognized a "narrow exception" to the rule, based on equity, not constitutional law: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  566 U.S. at 9, 16.  However, when the procedural default relates to post-conviction counsel's actions at the discretionary-review stage rather than at the initial-review stage of the collateral proceedings, habeas relief is not available:

> The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts.  It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . .

---

[4] Procedural default is a judicial doctrine "related to the statutory requirement that a habeas petitioner must exhaust any available state-court remedies before bringing a federal petition."  *Lovins v. Parker,* 712 F.3d 283, 294 (6th Cir. 2013) (citing 28 U.S.C. § 2254(b), (c)).

*Martinez*, 566 U.S. at 16 (citations omitted).

As to federal habeas claims that were adjudicated on the merits in state court, the federal court may not grant relief unless (1) the state court decision was contrary to, or an unreasonable application of, federal law, as determined by the Supreme Court, pursuant to 28 U.S.C. § 2254(d)(1); or (2) the decision was based on an unreasonable determination of the facts, pursuant to section 2254(d)(2).[5]

As to review of a state court decision under section 2254(d)(1), "[i]t is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" *Nevada v. Jackson,* 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter,* 562 U.S. 86, 102 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the [*Strickland v. Washington*, 466 U.S. 668 (1984)] standard itself." *Harrington*, 562 U.S. at 101. Claims of ineffective assistance of counsel are thus subject to a "'doubly deferential'" standard of review, in deference to both the state court

---

[5] Title 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim−
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

and defense counsel. *Woods v. Etherton,* 578 U.S. 113, 117 (2016) (per curiam) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). State court determinations of fact "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[6]

In *Strickland*, the Supreme Court set forth the relevant Sixth Amendment standard by which claims of ineffective assistance based on counsel's errors are evaluated on the merits; *Strickland* requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 688, 694. A court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. A court presumes "that counsel has 'rendered adequate assistance and made all

---

[6] Because the Law Court's decisions are the final state court adjudications on the merits of each claim, the decisions under review in this case are the Law Court's orders affirming the decisions of the trial court. *See Greene v. Fisher*, 565 U.S. 34, 40 (2011) (noting that the last state-court adjudication on the merits of the petitioner's constitutional claim occurred on direct appeal to the state's supreme court); *Clements v. Clark*, 592 F.3d 45, 52 (1st Cir. 2010) ("A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'") (quoting *Teti v. Bender*, 507 F.3d 50, 56-57 (1st Cir. 2007)).

However, because the Law Court's postconviction order did not explain the Court's reasoning for denying a certificate of probable cause, the federal court may consider the trial court's decision for those claims:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (noting the state may rebut the presumption).

significant decisions in the exercise of reasonable professional judgment.'" *Companonio v. O'Brien*, 672 F.3d 101, 110 (1st Cir. 2012) (quoting *Strickland*, 466 U.S. at 690).

A court considers "the totality of the evidence," and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

**B.    Ineffective Assistance of Trial Counsel and Actual Innocence Claims**

Petitioner argues that trial counsel provided ineffective assistance by failing to: (1) obtain DNA testing or call an expert witness, (2) call other witnesses, (3) challenge the composition of the grand jury or the trial jury, (4) file a motion for the grand jury minutes, and (5) file a motion for a mistrial based on alleged prosecutorial misconduct in the form of destruction of exculpatory evidence.

Petitioner did not raise the first or second claim in the request for discretionary review from the Law Court. Petitioner, therefore, failed to exhaust the claims fully, and because Maine law requires him to present all available claims in one proceeding, the claims are now procedurally defaulted. Because there is no constitutional right to counsel during postconviction proceedings, Petitioner cannot overcome the procedural default by asserting that postconviction counsel was ineffective for failing to raise the issues in his Law Court filings. Petitioner also cannot rely on the *Martinez* exception for procedural defaults resulting from claims omitted from initial-review collateral proceedings, because the claims here were raised in the initial-review collateral proceeding and omitted in the

subsequent proceeding.  Petitioner can only proceed with the claims, therefore, if he can show that it is more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt.

Petitioner cannot satisfy the standard for an actual innocence gateway claim for essentially the same reasons that many of his claims also fail on the merits: the state court considered the evidence Petitioner has raised in multiple filings and reasonably concluded that the new evidence does not create a likelihood of a different verdict (a less stringent standard).  Petitioner has not rebutted the presumption of correctness for the state court's findings.

Regarding the witnesses that Petitioner evidently argues trial counsel should have called, Ms. Higgins' statements are based on hearsay from a relative who is now deceased, Ms. Poulin recanted her statements, and the state court supportably found Ms. Indigo's testimony to be not credible.  Petitioner did not provide any reason for this Court to question that finding.  Regarding the new DNA evidence and the expert witness that Petitioner apparently argues trial counsel should have called to testify, the DNA evidence and expert opinion did not clearly implicate another suspect in a way that was inconsistent with an innocent explanation, such as the possibility that Ms. Dickson's son contributed the DNA on the sock rather than the ex-husband.  Furthermore, while Petitioner and the expert witness cite the lack of Petitioner's DNA on the sock as compelling evidence, as the Law Court reasonably noted, "[t]here is no evidence in [the] record … that would allow a fact-finder to find  … that [Petitioner] did not touch the sock—any more likely than others, i.e., that [Petitioner] touched but did not leave ("shed") his DNA on the sock, that he wore

gloves, or that he touched the sock in a location that was not sampled." *State v. Bates*, 2018 ME 5 ¶ 11.    The new expert witness also expressed doubt whether a sexual assault had occurred based on the condition of the body insofar as police found no evidence of genital or fingernail trauma, foreign hairs, or other secretions, but the expert's expectation of additional evidence is not enough to satisfy the standard required for an actual innocence claim.

Even if the Court were to consider the claims on the merits and even assuming the DNA evidence and the additional witness testimony were likely to be more convincing to a factfinder, the ineffective assistance claims would fail because Petitioner has not shown that an ordinary fallible attorney would have obtained and introduced the additional DNA evidence or identified and called the additional witnesses.    Evidently none of the fact witnesses had come forward or had an obvious connection to the crime such that counsel should have been on notice of the need to interview them before trial.    In fact, Petitioner does not allege that he or anyone else had a reason at the time of the trial to suspect they would provide exculpatory evidence.    As to counsel's failure to obtain additional DNA testing, the state court noted that trial counsel considered calling a DNA expert but decided against it when the potential witness warned counsel that it would be counterproductive for Petitioner.    In sum, the DNA evidence and new witness testimony were insufficient to overcome the procedural default and would not establish deficient performance or

prejudice even if the Court assumed that Petitioner could establish a gateway innocence claim.[7]

Because Petitioner did not raise the third, fourth or fifth ineffective assistance claims in the state court, those claims also fail because they are procedurally defaulted and because Petitioner has not established actual innocence.  To the extent that Petitioner might have intended to rely on the *Martinez* exception to argue that postconviction counsel was ineffective for omitting the trial-related ineffective assistance claims, the claims would still fail on the merits.

As discussed below, Petitioner's contentions about the racial composition of the grand jury and trial jury are unavailing.  Accordingly, counsel did not perform deficiently by omitting the arguments, and Petitioner suffered no prejudice as a result.  Similarly, because Petitioner has not explained the purpose of a motion for the grand jury minutes, he failed to establish deficient performance or prejudice based on the fact that counsel did not file such a motion.  Petitioner has also not established that the State willfully destroyed exculpatory evidence simply because recordings of certain interviews were no longer

---

[7] In addition to Ms. Higgins, Ms. Poulin, and Ms. Indigo, Petitioner raised for the first time in his reply brief five additional potential witnesses not cited in the § 2254 petition or in the state court proceedings. The failure to exhaust not only deprived the state court of the opportunity to consider the claim but the late assertion also deprived the State the opportunity to respond in this proceeding.  Nevertheless, a review of the allegations reveals that the analysis regarding the additional witnesses is not materially different from the analysis regarding the witnesses the state court considered.  For example, Petitioner identifies Cindy Bridges (also known as Cindy Higgins) as a witness, but the analysis is essentially the same as for Melody Higgins.  The other witnesses allegedly would have testified to seeing or having knowledge of Petitioner and Ms. Dickson being together in social or romantic situations in various locations before the murder, but with one exception, Petitioner does not describe when or how counsel should have learned of the individuals. As to the one individual for whom Petitioner provides more information, Peter Bouchard, Petitioner concedes that counsel had a legitimate tactical reason not to call the witness: counsel was familiar with the witness and believed he would not be a good witness.

available.  The loss of certain evidence over the course of many years does not imply that prosecutors or law enforcement acted in bad faith.  *See generally, United States v. Cruz-Osorio*, No. CV 22-285 (RAM), 2023 WL 7019422, at *6 (D.P.R. Oct. 25, 2023).  Even if there was more than Petitioner's speculation about the state actors' motives, the descriptions of the interview contained in the record (which Petitioner has provided no reason to doubt) do not show a reasonable likelihood that the recording would have made a difference in the jury's determination.  Mr. Quinn's statements do not appear to have been contested at trial, Petitioner does not dispute that the police questions were suggestive on the issue of committing a crime without any memory, and Petitioner was able to inquire and argue about the interview.  The jury evidently accepted the statements but still was not persuaded of Mr. Quinn's involvement.  Counsel, therefore, did not act unreasonably and Petitioner was not prejudiced by the decision to forego a motion for a mistrial, which motion would have been denied.

## C.    Ineffective Assistance of Postconviction Counsel Claim

Petitioner argues that postconviction counsel provided ineffective assistance by failing to file timely the second state court postconviction petition.  Because there is no federal constitutional right to counsel in connection with a collateral attack, the claim necessarily fails.  Furthermore, because the only prejudice Petitioner suffered from the deficient performance was the loss of his ability to assert the newly discovered evidence claim, and because the state court (consistent with the *Martinez* procedural default exception) already provided relief by considering the claim on the merits, there is no further relief to provide.

**D.      The Right to an Impartial Jury and the *Batson* Claim**

Petitioner claims that the state court erred by allowing three jurors to serve after the jurors acknowledged during jury selection that they had read a recently published article about the case which contained a fact—the presence of Ms. Dickson's young child in the apartment—which Petitioner sought to exclude and the State later agreed not to introduce as evidence.   The right to a jury trial and the right to due process of law contain "the fundamental idea[s] that no [person]'s life, liberty or property be forfeited as criminal punishment for violation of that law until there had been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement and tyrannical power," *Chambers v. State of Fla.*, 309 U.S. 227, 236–37 (1940), and that the jury's decision must be "based on evidence received in open court, not from outside sources."   *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966).

The Supreme Court "has long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial," *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979), and federal courts have reversed convictions or required a change of venue in extraordinary cases where a court did not or could not guard adequately against exposure to prejudicial publicity.   *See Irvin v. Dowd*, 366 U.S. 717, 726–28 (1961); *Sheppard*, 384 U.S. at 352–59.   The Supreme Court, however, has also instructed:

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of

the case. . . It is sufficient if the juror can lay aside his impression or opinion
and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722–23 (1961).  For those reasons, the trial court possesses "wide
discretion . . . in conducting voir dire in the area of pretrial publicity and in other areas of
inquiry that might tend to show juror bias," and "[a] trial court's findings of juror
impartiality may be overturned only for manifest error."  *Mu'Min v. Virginia*, 500 U.S.
415, 427–28 (1991) (internal quotation marks omitted).

The record demonstrates that the Law Court thoroughly examined the trial court's
independent inquiry into the exposure to publicity and the impact of the exposure on each
relevant juror's ability to remain impartial and base her or his deliberations only on the
evidence at trial.  A juror's assertion that he or she would remain impartial was not treated
as dispositive.  Defense counsel also did not seek their dismissal, which suggests their
responses might have revealed tactical reasons to want the jurors to serve.  Because the
publicity was not extreme, and because the extra-record fact was not so inflammatory that
it would suggest that no juror could remain impartial, Petitioner has not shown that the
state court's conclusion was contrary to or an unreasonable application of the law
articulated by the Supreme Court.

Petitioner also contends that his rights were violated because the only member of
the juror pool from a racial minority was excused for cause by the trial judge.  In *Batson v.
Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that the Equal Protection Clause
forbids a prosecutor from exercising peremptory challenges to remove potential jurors on

account of their race.  Courts ordinarily use a three-step process to determine whether a preemptory challenge is the product of purposeful discrimination:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008)).

Because Petitioner did not present the claim to the state court, he failed to exhaust the available state remedies and the claim is now procedurally barred.  For essentially the same reasons discussed above, Petitioner has not established actual innocence or cause and prejudice to set aside the procedural default.  Even if he could overcome the default, the claim would fail on the merits because according to Petitioner, the judge excused the juror for cause and the prosecution did not use a peremptory challenge on the juror.  Petitioner acknowledged that the judge's decision had a race-neutral basis.[8]  There is no evidence to support an inference of purposeful discrimination.[9]

---

[8] According to Petitioner, "only one minority, an African American woman was summoned for jury service, and she was subsequently excused for cause by the trial court for her role in her sister's pregnancy. . ." (Reply at 16, ECF No. 7.)

[9] Petitioner did not assert in his § 2254 petition his prior argument that Maine's statutes regarding jury selection procedures were unconstitutional, but he did raise the argument in his reply brief.  Petitioner provides no evidence that the procedures were unconstitutionally discriminatory.  Petitioner argues that the prior random selection procedures are suspect because Maine later changed the relevant law, but he provides no reason or authority to suggest that a mere change in the law implies the prior version was unconstitutional or had a discriminatory purpose.  In sum, the argument lacks merit for the reasons the state court explained.

### E.    Sufficiency of the Evidence Claim

Petitioner asserts the evidence is insufficient to support convictions for murder and gross sexual assault under Maine law.  The due process guarantee of the Fourteenth Amendment requires "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).  Under a *Jackson* sufficiency of the evidence claim, "the proper inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012) (internal quotation marks omitted).   "In a federal habeas proceeding, review of a sufficiency claim is doubly deferential: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA."  *Berila v. Watson*, No. 24-3188, 2024 WL 4023843, at *2 (6th Cir. July 12, 2024).

The Law Court determined that a reasonable jury could have found beyond a reasonable doubt that Petitioner and not Mr. Quinn committed the murder based on the evidence that: (1) Petitioner's sperm was found in Ms. Dickson's vagina, (2) Petitioner was not truthful when he spoke to investigators about his involvement with Ms. Dickson, (3) Ms. Dickson was afraid of him and was not afraid of Mr. Quinn, and (4) Petitioner left his residence for several hours late at night at the time of the murder.  The Law Court also determined that a reasonable jury could have found beyond a reasonable doubt that

Petitioner overpowered or compelled Ms. Dickson to have sexual intercourse based on the evidence that: (1) Petitioner's sperm was found in Ms. Dickson's vagina, (2) Ms. Dickson was afraid of him, (3) Ms. Dickson's body was half-naked, and (4) the body was covered with abrasions. The Law Court's conclusions were not contrary to or unreasonable applications of *Jackson* or its progeny. Even if the Court were able to consider the additional witnesses as Petitioner urges, the recantations of and credibility issues regarding the fact witnesses render the state court's decisions reasonable, and the opinion of the DNA expert does not constitute sufficient evidence to establish that no rational trier of fact could have found the essential elements of the crime given the weight of the other evidence in the case.[10]

## F.    Destruction of Evidence Claim

Petitioner alleges that the State committed prosecutorial misconduct by misplacing or destroying exculpatory evidence. According to Petitioner, the State never turned over the video and audio recording of the 1996 interview with Mr. Quinn in which he mentioned the sock and acquiesced to the suggestion that he could have committed a crime without any memory due to heavy drinking. The prosecutor told defense counsel and the trial court that the police said that the recording was missing or that they had lost the recording. Petitioner also alleges that the green sock eventually went missing during the

---

[10] *See Herrera v. Collins*, 506 U.S. 390, 402 (1993) ("*Jackson* does not extend to nonrecord evidence, including newly discovered evidence. . . . [T]he *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit") (emphasis in original).

postconviction proceedings, although it evidently was available for multiple rounds of DNA testing over many years, and Petitioner does not specify when it became unavailable.

Because Petitioner did not raise the issue with the state court, he failed to exhaust the state remedies and the argument is now procedurally defaulted. Petitioner cannot overcome the default because he has not established actual innocence and he has not shown that counsel performed deficiently or that Petitioner suffered any prejudice from the failure to raise the prosecutorial misconduct argument at trial or on appeal. The claim also fails because Petitioner has provided no evidence to support a finding of a bad faith motive as opposed to inadvertent mistake or routine procedures regarding the preservation of evidence.

## CONCLUSION

Based on the foregoing analysis, an evidentiary hearing is not warranted under Rule 8 of the Rules Governing Section 2254 Cases. I recommend the Court dismiss Petitioner's petition for habeas relief under 28 U.S.C. § 2254, and that the Court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2254 Cases because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

## <u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen

(14) days of being served with a copy thereof.  A responsive memorandum and shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 12th day of December, 2024.